# UNITED STATES *v.* WEBER AIRCRAFT CORP. ET AL.

No. 82–1616.   Argued January 11, 1984—Decided March 20, 1984

STEVENS, J., delivered the opinion for a unanimous Court.

*Samuel A. Alito, Jr.*, argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Geller, Leonard Schaitman,* and *Wendy M. Keats.*

*Jacques E. Soiret* argued the cause for respondents. With him on the brief for respondent Weber Aircraft Corp. were *Marshall Silberberg* and *Robert M. Churella. Lawrence J. Galardi* and *Dean F. Cochran* filed a brief for respondent Mills Manufacturing Corp.*

JUSTICE STEVENS delivered the opinion of the Court.

The Freedom of Information Act (FOIA), 5 U. S. C. § 552 (1982 ed.), requires federal agencies to disclose records[1] that

---

*Briefs of *amici curiae* urging affirmance were filed for the Reporters Committee for Freedom of the Press et al. by *Karen Syma Shinberg Czapanskiy;* for United States Forgecraft Corp. by *Donald A. Way;* and for Inderjit Badhwar et al. by *Raymond D. Battocchi* and *Alfred F. Belcuore.*

[1] "On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action." 5 U. S. C. § 552(a)(4)(B) (1982 ed.).

do not fall into one of nine exempt categories.[2]   The question presented is whether confidential statements obtained during an Air Force investigation of an air crash are protected from disclosure by Exemption 5, which exempts "inter-agency or intra-agency memorandums or letters which would not be

_____

[2] "This section does not apply to matters that are—

"(1) (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

"(2) related solely to the internal personnel rules and practices of an agency;

"(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

"(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

"(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

"(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

"(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel;

"(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

"(9) geological and geophysical information and data, including maps, concerning wells."   5 U. S. C. § 552(b) (1982 ed.).

available by law to a party other than an agency in litigation with the agency."

## I

On October 9, 1973, the engine of an Air Force F–106B aircraft failed in flight. Captain Richard Hoover, the pilot, was severely injured when he ejected from the plane. Under Air Force regulations, the incident was a significant air crash that required two separate investigations: a "collateral investigation" and a "safety investigation."

The collateral investigation is conducted "to preserve available evidence for use in claims, litigation, disciplinary actions, administrative proceedings, and all other purposes."[3] Witnesses in a collateral investigation testify under oath and generally are protected by the procedural safeguards that are applicable in other formal hearings. The record of the collateral investigation is public.

The safety investigation is quite different. It is conducted by a specially appointed tribunal which prepares a report that is intended for "the sole purpose of taking corrective action in the interest of accident prevention."[4] To encourage witnesses to speak fully and frankly, they are not sworn and receive an assurance that their statements will not be used for any purpose other than accident prevention.[5] Air Force regulations contain a general prohibition against the release of safety investigation reports and their attachments,[6] subject to an exception which allows the Judge Advocate General to release specified categories of "factual material" and "nonpersonal evidence."[7]

---

[3] Air Force Regulations 110–14, ¶ 1(a) (July 18, 1977).

[4] Air Force Regulations 127–4, ¶ 19(a)(1) (Jan. 1, 1973).

[5] *Id.*, ¶ 3–8(d) (Jan. 18, 1980).

[6] *Id.*, ¶ 19(a)(3) (Jan. 1, 1973); *id.*, ¶¶ 2–4, 2–5 (Jan. 18, 1980).

[7] *Id.*, ¶ 19(a)(4) (Jan. 1, 1973) states: "Notwithstanding the restrictions on use of these reports and their attachments and the prohibitions in this regulation against their release, factual material included in

After the collateral and safety investigations had been completed, Captain Hoover filed a damages action against various entities responsible for the design and manufacture of his plane's ejection equipment.[8]  During pretrial discovery in that litigation, two of the parties (respondents Weber[9] and Mills[10]) sought discovery of all Air Force investigative reports pertaining to the accident.  The Air Force released the entire record of the collateral investigation, as well as certain factual portions of the safety investigation, but it refused to release the confidential portions of the safety investigation.

Confidential statements made to air crash safety investigators were held to be privileged with respect to pretrial discovery over 20 years ago.  *Machin* v. *Zukert*, 114 U. S. App. D. C. 335, 316 F. 2d 336, cert. denied, 375 U. S. 896 (1963). That holding effectively prevented respondents from obtaining the pretrial discovery they sought—specifically the unsworn statements given by Captain Hoover and by the airman who had rigged and maintained his parachute equipment.  Respondents therefore filed requests for those statements under the FOIA, and when the Air Force refused production, they commenced this action.

In the District Court the Government filed an affidavit executed by the General responsible for Air Force safety investigations, explaining that the material that had been withheld

---

accident/incident reports, covering examination of wreckage, photographs, plotting charts, wreckage diagrams, maps, transcripts of air traffic communications, weather reports, maintenance records, crew qualifications, and like nonpersonal evidence may be released as required by law or pursuant to court order or upon specific authorization of The Judge Advocate General after consultation with The Inspector General.  Also, Federal law requires that an accused in a trial by court-martial will, upon proper court order, be furnished all statements sworn or unsworn in any form which have been given to any Federal agent, employee, investigating officer, or board by any witness who testifies against the accused."

[8] *Hoover* v. *Weber Aircraft Corp.*, No. CV 74–1064–WPG (CD Cal.).

[9] Weber Aircraft Corp.

[10] Mills Manufacturing Corp.

contained "conclusions, speculations, findings and recommendations made by the Aircraft Mishap Investigators" as well as "testimony provided by witnesses under a pledge of confidentiality." App. 38. The affidavit explained why the General believed that the national security would be adversely affected by the disclosure of such material.[11] The District Court held that the material at issue would not be available by law to a party other than an agency in litigation with an agency, and hence need not be disclosed by virtue of

---

[11] "[T]he release of the withheld portions of the Aircraft Mishap Investigation for litigation purposes would be harmful to our national security. The strength of the United States Air Force, upon which our national security is greatly dependent, is seriously affected by the number of major aircraft accidents which occur. The successful flight safety program of the United States Air Force has contributed greatly to the continuously decreasing rate of such accidents. The effectiveness of this program depends to a large extent upon our ability to obtain full and candid information on the cause of each aircraft accident. Much of the information received from persons giving testimony in the course of an aircraft mishap investigation is conjecture, speculation and opinion. Such full and frank disclosure is not only encouraged but is imperative to a successful flight safety program. Open and candid testimony is received because witnesses are promised that for the particular investigation their testimony will be used solely for the purpose of flight safety and will not be disclosed outside of the Air Force. Lacking authority to subpoena witnesses, accident investigators must rely on such assurances in order to obtain full and frank discussion concerning all the circumstances surrounding an accident. Witnesses are encouraged to express personal criticisms concerning the accident.

"If aircraft mishap investigators were unable to give such assurances, or if it were felt that such promises were hollow, testimony and input from witnesses and from manufacturers in many instances would be less than factual and a determination of the exact cause factors of accidents would be jeopardized. This would seriously hinder the accomplishment of prompt corrective action designed to preclude the occurrence of a similar accident. This privilege, properly accorded to the described portions of an United States Air Force Mishap Report of Investigation, including those portions reflecting the deliberations of the Investigating Board, is the very foundation of a successful Air Force flight safety program." App. 38–39.

Exemption 5.[12]   The Court of Appeals reversed.   688 F. 2d 638 (CA9 1982).   It agreed that the requested documents were "intra-agency memorandums" within the meaning of Exemption 5, and that they were protected from civil discovery under the *Machin* privilege.   It held, however, that the statutory phrase "would not be available by law" did not encompass every civil discovery privilege but rather reached only those privileges explicitly recognized in the legislative history of the FOIA.   It read that history as accepting an executive privilege for predecisional documents containing advice, opinions, or recommendations of Government agents, but as not extending to the *Machin* civil discovery privilege for official Government information.   It accordingly remanded the case with directions to disclose the factual portions of the witnesses' statements.

## II

The plain language of the statute itself, as construed by our prior decisions, is sufficient to resolve the question presented.   The statements of the two witnesses are unquestionably "intra-agency memorandums or letters"[13] and, since the *Machin* privilege normally protects them from discovery in civil litigation, they "would not be available by law to a party other than [the Air Force] in litigation with [the Air Force]."[14]

---

[12] The District Court also held that a medical report sought by respondents was covered by Exemption 5, and that disclosure of both the report and the statements was inappropriate because in its view the public interest in maintaining confidentiality outweighed respondents' interests in obtaining the material.   The Court of Appeals rejected both of these holdings, and the Government does not seek review on either.

[13] Weber contends that "intra-agency memorandums or letters" cannot include statements made by civilians to Air Force personnel.   Whatever the merits of this assertion, it is irrelevant to this case since the material at issue here includes only statements made by Air Force personnel.

[14] Weber contends that the material at issue is not privileged because it was not obtained pursuant to a promise of confidentiality.   However,

Last Term, in *FTC* v. *Grolier Inc.*, 462 U. S. 19 (1983), we held that Exemption 5 simply incorporates civil discovery privileges: "The test under Exemption 5 is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance." *Id.*, at 26.[15] Thus, since the *Machin* privilege is well recognized in the case law as precluding routine disclosure of the statements, the statements are covered by Exemption 5.

*Grolier* was consistent with our prior cases. For example, *Grolier* itself relied on *Renegotiation Board* v. *Grumman Aircraft Engineering Corp.*, 421 U. S. 168 (1975), which *Grolier* quoted on the scope of Exemption 5: "'Exemption 5 incorporates the privileges which the Government enjoys under the relevant statutory and *case law* in the pretrial discovery context.'" 462 U. S., at 26–27 (emphasis added in *Grolier*) (quoting 421 U. S., at 184). Similarly, in *NLRB* v. *Sears, Roebuck & Co.*, 421 U. S. 132 (1975), we wrote: "Exemption 5 withholds from a member of the public documents which a private party could not discover in litigation with the agency." *Id.*, at 148.[16] In *Federal Open Market Committee* v. *Merrill*, 443 U. S. 340 (1979), we wrote: "The House Report [on the FOIA] states that Exemption 5 was intended to

---

the District Court found otherwise, and since that finding is supported by an uncontroverted affidavit submitted by the Government to the District Court, see *id.*, at 38, there is no basis for setting it aside. In all other respects, respondents concede that the requested material is covered by the *Machin* privilege, and did not file a cross-petition for certiorari challenging the Court of Appeals' conclusion that the requested material was privileged. Thus, we assume without deciding that the material respondents seek is privileged, and do not consider the arguments of *amici* that no privilege is applicable here. See *United Parcel Service, Inc.* v. *Mitchell*, 451 U. S. 56, 60, n. 2 (1981); *Bell* v. *Wolfish*, 441 U. S. 520, 531–532, n. 13 (1979); *Knetsch* v. *United States*, 364 U. S. 361, 370 (1960).

[15] See also 462 U. S., at 28 (BRENNAN, J., concurring in part and concurring in judgment).

[16] See also 421 U. S., at 149 (footnote omitted) ("[I]t is reasonable to construe Exemption 5 to exempt those documents, and only those documents, normally privileged in the civil discovery context").

allow an agency to withhold intra-agency memoranda which would not 'routinely be disclosed to a private party through the discovery process in litigation with the agency . . . .'" *Id.*, at 353 (quoting H. R. Rep. No. 1497, 89th Cong., 2d Sess., 10 (1966)). And in *EPA* v. *Mink*, 410 U. S. 73 (1973), the Court observed: "This language clearly contemplates that the public is entitled to all such memoranda or letters that a private party could discover in litigation with the agency." *Id.*, at 86.[17]

Respondents read *Merrill* as limiting the scope of Exemption 5 to privileges explicitly identified by Congress in the legislative history of the FOIA. But in *Merrill* we were confronted with a claimed exemption that was not clearly covered by a recognized pretrial discovery privilege. We held that Exemption 5 protected the Federal Open Market Committee's Domestic Policy Directives although it was not entirely clear that they fell within any recognized civil discovery privilege because statements in the legislative history supported an inference that Congress intended to recognize such a privilege. See 443 U. S., at 357–360. Thus, the *holding* of *Merrill* was that a privilege that was mentioned in the legislative history of Exemption 5 is incorporated by the Exemption—not that all privileges not mentioned are ex-

---

[17] Respondents contend that *Mink* stands for the proposition that purely factual material can never qualify for protection under Exemption 5. However, the relevant portion of *Mink* merely states that otherwise nonprivileged factual material cannot be withheld under Exemption 5 merely because it appears in the same document as privileged material, and that Congress intended to adopt the relevant case law on privilege. Moreover, *Mink* cited *Machin* with approval as part of that case law. See 410 U. S., at 87–91, and n. 14. This reading of *Mink* is confirmed by the 1974 amendment to the FOIA which provides: "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U. S. C. § 552(b) (1982 ed.). This amendment constituted Congress' codification of this aspect of *Mink*. See S. Rep. No. 93–854, p. 32 (1974); 120 Cong. Rec. 17021 (1974) (remarks of Sen. Hruska).

cluded. Moreover, the *Merrill* dictum upon which respondents rely merely indicates "that it is not clear that Exemption 5 was intended to incorporate every privilege known to civil discovery." *Id.*, at 354. It is one thing to say that recognition under Exemption 5 of a novel privilege, or one that has found less than universal acceptance, might not fall within Exemption 5 if not discussed in its legislative history. It is quite another to say that the *Machin* privilege, which has been well settled for some two decades, need be viewed with the same degree of skepticism.[18] In any event, the *Merrill* dictum concludes only that "a claim that a privilege other than executive privilege or the attorney privilege is covered by Exemption 5 must be viewed with caution." 443 U. S., at 355. The claim of privilege sustained in *Machin* was denominated as one of executive privilege. See 114 U. S. App. D. C., at 337, 316 F. 2d, at 338.[19] Hence the dictum is of little aid to respondents.

Moreover, respondents' contention that they can obtain through the FOIA material that is normally privileged would create an anomaly in that the FOIA could be used to supplement civil discovery. We have consistently rejected such a construction of the FOIA. See *Baldrige* v. *Shapiro*, 455 U. S. 345, 360, n. 14 (1982); *NLRB* v. *Sears, Roebuck & Co.*, 421 U. S., at 143, n. 10; *Renegotiation Board* v. *Bannercraft Clothing Co.*, 415 U. S. 1, 24 (1974). We do not

---

[18] Moreover, in the *Merrill* dictum we added: "We hesitate to construe Exemption 5 to incorporate a civil discovery privilege that would substantially duplicate another exemption." 443 U. S., at 355. Respondents do not explain how incorporation of the *Machin* privilege into Exemption 5 would substantially duplicate another exemption. The relevance of the *Merrill* dictum is further reduced by the fact that in *Merrill* the Court explicitly reserved the question whether the *Machin* privilege falls within Exemption 5. See 443 U. S., at 355–356, n. 17. Thus *Merrill* could hardly control the question we face today.

[19] The regulation governing the *Machin* privilege also describes it as executive privilege. Air Force Regulations 127–4, ¶ 2–5 (Jan. 18, 1980).

think that Congress could have intended that the weighty policies underlying discovery privileges could be so easily circumvented.[20]

Finally, the legislative history of Exemption 5 does not contain the kind of compelling evidence of congressional intent that would be necessary to persuade us to look beyond the plain statutory language. Because of the difficulty inherent in compiling an exhaustive list of evidentiary privileges,[21] it would be impractical to treat the legislative history of Exemption 5 as containing a comprehensive list of all privileges Congress intended to adopt. Rather, the history of Exemption 5 can be understood by means of "rough analogies." *EPA* v. *Mink, supra,* at 86. The legislative history of Exemption 5 indicates that Congress intended to incorporate governmental privileges analogous to the *Machin* privilege. That history recognizes a need for claims of privilege when confidentiality is necessary to ensure frank and open discussion and hence efficient governmental operations. See *Grolier,* 462 U. S., at 27–28; *Merrill,* 443 U. S., at 359; *Renegotiation Board* v. *Grumman Aircraft Engineering Corp.,* 421 U. S., at 186, 189–190; *NLRB* v. *Sears, Roebuck & Co., supra,* at 150–152; *Mink, supra,* at 86–89; H. R. Rep. No. 1497, 89th Cong., 2d Sess., 10 (1966); S. Rep.

---

[20] Respondents also argue that their need for the requested material is great and that it would be unfair to expect them to defend the litigation brought against them by Captain Hoover without access to it. We answered this argument in *Grolier,* noting that the fact that in particular litigation a party's particularized showing of need may on occasion justify discovery of privileged material in order to avoid unfairness does not mean that such material is routinely discoverable and hence outside the scope of Exemption 5. See 462 U. S., at 27–28. Respondents must make their claim of particularized need in their litigation with Captain Hoover, since it is not a claim under the FOIA.

[21] This difficulty is illustrated by the controversy surrounding the proposed provisions of the Federal Rules of Evidence governing privileges, which were rejected by Congress. See generally 2 J. Weinstein & M. Berger, Evidence ¶501[01] (1982).

No. 813, 89th Cong., 1st Sess., 9 (1965).[22]   The *Machin* privi-
lege was recognized for precisely this reason.[23]   Thus, the
*Machin* privilege is sufficiently related to the concerns ex-
pressed in the legislative history[24] that we cannot say that
the legislative history demonstrates that the statute should
not be construed to mean what it says with respect to the
*Machin* privilege.[25]

---

[22] Moreover, the Senate Report stated that Exemption 5 had been
drafted in response to comments of federal agencies made in the course of
Committee hearings, S. Rep. No. 813, at 4, 9.   During those hearings, the
Government submitted material indicating that the *Machin* privilege
should be incorporated into the FOIA.   See Administrative Procedure
Act: Hearings before the Subcommittee on Administrative Practice and
Procedure of the Senate Committee on the Judiciary, 89th Cong., 1st
Sess., 196, 206, 366–367, 418 (1965).

[23] "We agree with the Government that when disclosure of investigative
reports obtained in large part through promises of confidentiality would
hamper the efficient operation of an important Government program and
perhaps even, as the Secretary here claims, impair the national security by
weakening a branch of the military, the reports should be considered privi-
leged."   114 U. S. App. D. C., at 338, 316 F. 2d, at 339.

It follows that recognition of the *Machin* privilege would not be incon-
sistent with the fundamental goals of the FOIA since it does not necessar-
ily reduce the amount of information available to the public.   The privilege
is recognized because the Government would not be able to obtain the in-
formation but for its assurance of confidentiality.   Thus, much if not all of
the information covered by the *Machin* privilege would not find its way
into the public realm even if we refused to recognize the privilege, since
under those circumstances the information would not be obtained by the
Government in the first place.

[24] Cf. *Federal Open Market Committee* v. *Merrill*, 443 U. S. 340, 357–360
(1979) (privilege for Federal Reserve's Open Market Committee's policy
directives sufficiently analogous to privilege for confidential information
concerning Government contracts mentioned in Exemption 5's legislative
history to merit incorporation into Exemption 5).

[25] Respondents rely on the fact that in recent years Congress has several
times failed to act on proposed legislation which would have codified the
*Machin* privilege.   However, this does not represent a rejection of the
privilege.   To the contrary, Congress has enacted Federal Rule of Evi-
dence 501, which recognizes the power of the courts to fashion common-law

We therefore simply interpret Exemption 5 to mean what it says.  The judgment of the Court of Appeals is

*Reversed.*

---

rules of privilege.  Congressional refusal to codify the *Machin* privilege hardly limits the power of courts to recognize the privilege under Rule 501. Indeed, Rule 501 was adopted precisely because Congress wished to leave privilege questions to the courts rather than attempt to codify them.  See H. R. Rep. No. 93–650, p. 8 (1973); S. Rep. No. 93–1277, pp. 11, 13 (1974); *supra,* at 802–803, and n. 21.  Congressional failure to codify this privilege is therefore irrelevant to our inquiry.  Respondents also rely on legislation enacted after Exemption 5 concerning the scope of Exemption 3 and various other statutes.  This legislation obviously sheds no light on the scope of Exemption 5.