**VOYAGEURS NATIONAL PARK ASSOCIATION DEFENDERS OF WILDLIFE, Sierra Club, National Parks and Conservation Association, Friends of the Earth, Friends of Animals and Their Environment, Help Our Wolves Live, Inc., the International Ecology Society, and the National Audubon Society, Plaintiffs,**

v.

**G. Ray ARNETT as Assistant Secretary of the Interior for Fish and Wildlife and Parks, the Department of Interior, and the Minnesota Department of Natural Resources, Defendants.**

Civ. No. 3–84–261.

United States District Court,
D. Minnesota,
Third Division.

March 6, 1985.

Brian B. O'Neill, Amy B. Bromberg, and Cynthia Pope, law student, Minneapolis, Minn., for plaintiffs.

Lisa Hemmer, Washington, D.C., and Jon Hopeman, Minneapolis, Minn., for G. Ray Arnett and the Dept. of Interior.

Philip J. Olfelt, and C. Paul Farici, St. Paul, Minn., for the Minn. Dept. of Natural Resources.

## MEMORANDUM AND ORDER

RENNER, District Judge.

Before the Court are 1) plaintiffs' motion for summary judgment on Count I of the Complaint; 2) defendant Minnesota Department of Natural Resources' motion to dismiss the complaint for failure to state a claim for relief; and 3) defendants G. Ray Arnett and the Department of Interior's motion for summary judgment. The Court, having accepted affidavits and exhibits on these matters, will treat all the motions as requesting summary judgment.

## FACTS

Plaintiffs are nine environmental organizations challenging the federal approval of a state wildlife management plan governing the eastern portion of Black Bay in Rainy Lake in the state of Minnesota. The one thousand acre area at the eastern end of Black Bay is known as the Gold Portage area. It consists primarily of water, including only about thirty acres of dry land. H.Rep. No. 871, 97th Cong., 2nd Sess. 3 (1982) [hereinafter cited as *"House Report"*]. This tract of land and water was once a part of Voyageurs National Park (hereinafter "the Park" or "Voyageurs").

The recent history of the Gold Portage area lends perspective to this controversy. In 1971, Congress authorized Voyageurs National Park. *See* Pub.L. No. 91–661, 84 Stat. 1970–1973, 16 U.S.C.A. §§ 160–160k (West 1973). Before the Park could be formally established, Congress required the State of Minnesota (hereinafter "the State") to donate to the United States all State lands within the proposed park boundaries. *Id.* § 160a (West Supp.1984). The Gold Portage region was part of these lands. In 1975, Minnesota completed the transfer of its lands to the federal government, and the Secretary of Interior (hereinafter "the Secretary") formally established Voyageurs National Park. *See* Minn.Stat. § 84B.01–.10 (1984); 40 Fed.Reg. 15,921–15,922 (April 8, 1975).

Inclusion of the Gold Portage region within the Park boundaries generated extensive controversy. *House Report* at 3. Apparently, an early version of a map representing the proposed Voyageurs National Park excluded this area and led some people to believe it would not become part of the Park. *Public Land Management Policy: Hearings Before the Subcomm. on Public Lands and National Parks of the Comm. on Interior and Insular Affairs, House of Representatives,* 97th Cong., 2nd Sess. 11 (1982).

Once it became part of Voyageurs, National Park regulations prohibited all hunting and trapping there. 36 C.F.R. §§ 2.2, 2.4 (1984). Since the eastern end of Black Bay was reputedly one of the few good duck hunting spots in the county, local interests were, from the beginning, disgruntled with the duck hunting prohibition. Letter to George B. Hertzog from Robert L. Herbst (April 13, 1972). The federal government's authority to regulate hunting on the bay was challenged, without success. *See United States v. Brown,* 431 F.Supp. 56 (D.Minn.1976), *aff'd,* 552 F.2d 817 (8th Cir.), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). Thereafter, the duck hunting controversy continued to inhibit the development of the Park.

In an attempt to eliminate the dispute, Congress enacted the Boundary Revision Act (hereinafter "the Act"). Act of Jan. 3, 1983, Pub.L. No. 97–405, 96 Stat. 2028, 16 U.S.C.A. § 160a–1 (West Supp.1984). The Act deleted the one thousand acre region of Black Bay from the Park and transferred it back to the State. *Id.* § 160a–1(b)(1)(E). In return, Minnesota gave other lands to the United States for inclusion in Voyageurs. *Id.* § 160a–1(b)(1)(C), (D).

Before the Gold Portage tract could be transferred to the State, the Act required that the State enter into an agreement satisfactory to the Secretary that:

(i) the State has established a wildlife management area in the area authorized to be deleted and conveyed to the State by paragraph (1)(E);

(ii) the State has prepared a plan acceptable to the Secretary to manage all the waters of and State lands riparian to

Black Bay (including all of the State-owned lands and waters of Rainy Lake) to preserve to the fullest extent possible the purposes for which the park was established.

*Id.* § 160a–1(b)(2)(B)(i), (ii). Paragraph (1)(E), requiring the wildlife management area, refers to the one thousand acres of Black Bay to be conveyed to the State.

On September 27, 1984, the Secretary (acting through the Midwest Regional Director of the National Park Service) entered into an agreement with the State pursuant to section 160a.[1] The wildlife management plan (hereinafter "the Plan") submitted under the agreement permitted duck hunting during its established seasons. · The plan also permitted trapping, stating as follows:

> Furbearers may only be taken by trapping during the established seasons within the established zones. Unprotected mammals may only be taken during an open trapping season for any protected species, but only during such hours and dates and by the same methods as allowed for taking protected species. The Park Service and the DNR will monitor trapping and its effects on animal populations, including incidental taking of animals for which there is no open season. If it is determined that trapping results

in *significant adverse effects on these populations within Voyageurs National Park*, the Commissioner will further limit or prohibit trapping by order.

State of Minnesota, Dep't of Natural Resources, Commissioner's Order No. 2162 (September 9, 1983) (emphasis supplied).

## CLAIMS OF PARTIES

In Count One (I) of their Complaint, plaintiffs allege the Secretary violated the Boundary Revision Act by approving a wildlife management plan which permitted trapping in the Gold Portage area and the remainder of Black Bay. During argument, plaintiffs narrowed their request to one for declaratory relief as to the Gold Portage area. Plaintiffs request judgment declaring that the Secretary violated the Act. In Count Three (III) of the Complaint,[2] plaintiffs allege that the Secretary's approval of the Plan was arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C.A. §§ 701–706 (West 1977). Finally, plaintiffs allege that the Environmental Assessment of the wildlife management plan was contrary to the National Environmental Policy Act, 42 U.S.C.A. · §§ 4321–4370a (West 1977 & Supp.1984) and the Council on Environmental Quality Regulations, 40 C.F.R. §§ 1500–1517.7 (1984).

---

1. The State first submitted a draft management plan to the Superintendent of Voyageurs (hereinafter "the Superintendent") for comments. Letter to Russell W. Berry from Joseph N. Alexander (April 29, 1983). This plan permitted waterfowl hunting, game hunting, and trapping. The Superintendent objected to the provisions for game hunting and trapping as contrary to congressional intent. Memorandum to Regional Director, Midwest Region from Superintendent, Voyageurs National Park (May 31, 1983). The Department of Interior's Acting Regional Director for the Midwest Region concurred in the Superintendent's objections. Memorandum to Superintendent, Voyageurs from Acting Regional Director, Midwest Region (June 8, 1983). In response, the State deleted the provision for game hunting but refused to eliminate the trapping section. Letter to Russell W. Berry from Joseph N. Alexander (July 20, 1983). Contrary to the recommendation of the Park Superintendent, the Acting Regional Director approved the management plan with the trapping provi-

sion, and the land was conveyed by quit claim deed on September 27, 1983. *See* Memorandum to Regional Director, Midwest Region from Superintendent, Voyageurs National Park (September 12, 1983); Agreement Between the United States of America and the State of Minnesota Regarding the Management of Certain Waters of and Adjacent to Black Bay of Rainy Lake (September 13, 1983).

2. Count Two (II) of plaintiffs' complaint contains allegations that the Secretary violated the Endangered Species Act, 16 U.S.C. §§ 1531–1543 (West 1974 & Supp.1975–1983), by failing to consult with the Fish and Wildlife Service on the effects of trapping on the endangered grey wolf and bald eagle species. *See id.* § 1536. On May 18, 1984, the Secretary consulted with the Fish and Wildlife Service pursuant to 16 U.S.C. § 1536. Consequently, this issue is moot. Plaintiffs may, however, still challenge the Fish and Wildlife Service's finding of "no jeopardy" as arbitrary and capricious.

Defendants contend that they are entitled to summary judgment on all counts of the Complaint. They argue that the agreement between the Secretary and the State is lawful and consistent with congressional intent. Defendants further assert that the actions of the Secretary and the Fish and Wildlife Service were neither arbitrary nor capricious. Finally, defendants claim that the Environmental Assessment's finding of no significant environmental consequences was not unreasonable.

## ANALYSIS

In ruling on a summary judgment motion, the Court must determine whether there is any issue of material fact precluding such judgment and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). As to Count One (I), the parties do not dispute the facts but disagree as to their interpretations of the Boundary Revision Act. Plaintiffs reason that by permitting trapping, the Plan violates the Act because it does not "complement to the fullest extent possible the purposes for which the Park was established." *See* 16 U.S.C.A. § 160a–1(b)(2)(B)(ii). Plaintiffs construe the clear intent of Congress to forbid all hunting and trapping within the Gold Portage area except duck hunting. Defendants argue that Congress left approval of the Plan's hunting and trapping provisions to the Secretary's discretion. Defendants contend that the Act, on its face, does not prohibit trapping and that park purposes do not ·specifically preclude trapping. Furthermore, defendants interpret Congress' intent as permitting a wildlife management plan that allows trapping.

### 1. Facial Analysis

■■■■■ A de novo standard of review is to be applied to agency interpretations of questions of law, such as the interpretation of a statute. *First National Bank in Sioux Falls v. National Bank of South Dakota,* 667 F.2d 708, 711 (8th Cir.1981). The starting point for the statutory analysis must be the plain language of the statute itself. *United States Marshal Service v. Means,* 741 F.2d 1053, 1056 (8th Cir.1984) (citing *Kosak v. United States,* 465 U.S. 848, ——, 104 S.Ct. 1519, 1523, 79 L.Ed.2d 860 (1984); *United States v. Weber Aircraft Corp.,* 465 U.S. 792, ——, 104 S.Ct. 1488, 1492, 79 L.Ed.2d 814 (1984) ). If the language is unambiguous, absent a clearly expressed legislative intent to the contrary, the language is usually considered conclusive. *Id.* (citing *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983) ).

As to the thousand acres involved in this dispute, the Act required two things. First, the State must establish a "wildlife management area" in the Gold Portage region. 16 U.S.C.A. § 160a–1(b)(2)(B)(i). Second, the State must develop

> a plan acceptable to the Secretary to manage all the waters of and State land riparian to Black Bay (including all of the State-owned lands and waters of Rainy Lake) *to preserve the natural resources of the area so as to complement to the fullest extent possible the purposes for which the park was established.*

*Id.* § 160a–1(b)(2)(B)(ii) (emphasis supplied). On its face, neither provision refers to hunting or trapping. Defendants argue that the absence of a specific reference to these activities indicates that they are permitted. The Court disagrees.

The plain meaning of the phrase "wildlife management area" suggests that wildlife is to be managed in a particular manner. The phrase could mean that wildlife is to be managed by permitting extensive hunting and trapping designed to limit wildlife populations. Alternatively, "wildlife management" may mean that the taking of wildlife is prohibited so as to preserve natural wildlife populations. "Wildlife management area" could also refer to the term as it is used by the Minnesota Department of Natural Resources. *See* State of Minnesota, Dep't of Natural Resources Commissioner's Order No. 1961, Regulations Relating to the Public Use of Wildlife Management Areas, § 2. This ambiguity in the term "wildlife management area" requires the

Court to look elsewhere for insight into the congressional intent.

Both parties seize upon section 160a–1(b)(2)(B)(ii) as support for their respective positions. Defendants contend that the language "the purposes for which the park was established" refers to section 160 of Title 16, United States Code which recites the "purpose" for Voyageurs as:

> to preserve, for the inspiration and enjoyment of present and future generations, the outstanding scenery, geological conditions, and waterway system which constituted a part of the historic route of the Voyageurs who contributed significantly to the opening of the Northwestern United States.

16 U.S.C.A. § 160 (West 1973). Since an explicit prohibition against trapping is not included, defendants argue that the decision to permit trapping was within the State and Secretary's discretions.

Plaintiffs argue that "the purposes for which the park was established" also refers to the 1916 Organic Act in which the "fundamental purpose" of national parks is described as:

> *to conserve* the scenery and the natural and historic objects and *the wildlife* therein and to provide *for the enjoyment of the same in such manner* and by such means *as will leave them unimpaired for the enjoyment of future generations.*

16 U.S.C.A. § 1 (West 1974). Since the Boundary Revision Act refers to the plural "purposes," and sections one and 160 each describe a park "purpose," the Court is of the opinion that, under the Act, "park purposes" refers to both sections one and 160. In addition, the Eighth Circuit has said that, "the fundamental purpose of national parks, *including Voyageurs Park*, is 'to conserve ... the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave [it] unimpaired for the enjoyment of future generations.'" *United States v. Brown*, 552 F.2d 817, 822 n. 7 (8th Cir.), *cert. denied*, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977) (quoting 16 U.S.C.A. § 1) (emphasis supplied). To implement this purpose, the Secretary has passed regulations prohibiting all hunting and trapping within national parks. 36 C.F.R. §§ 2.2, 2.4 (1984).

Plaintiffs argue that if park purposes require that wildlife be unimpaired for the enjoyment of future generations, then the Plan's trapping provision violates the Act because it does not "complement [park purposes] to the *fullest extent possible*" as stated in section 160a–1(b)(2)(B)(ii). Congress structured the Boundary Revision Act to treat the Gold Portage area separately. This region alone was designated as a "wildlife management area." 16 U.S.C.A. § 160a–1(b)(2)(B)(i). Because it was national parkland, Congress had a strong interest in controlling the tract's future uses. Furthermore, the Gold Portage area extends into national park territory much like a peninsula extends into a body of water.

Congress, however, required that the Gold Portage area, as well as all of the State-owned lands and waters of Rainy Lake, be managed so as to complement park purposes to the fullest extent possible. *Id.* § 160a–1(b)(2)(B)(ii). If the Court were to construe this section to prohibit trapping as inconsistent with park purposes, it would impose federal regulations against trapping upon all State owned waters of, and land riparian to, Rainy Lake. This area includes much State owned land not previously part of Voyageurs, and over which national park regulations would not ordinarily apply. Moreover, such an interpretation would logically require a wildlife hunting prohibition in the entire area, a measure which might generate yet another bitter controversy. Therefore the Court rejects such a construction of subpart (ii). Yet, because of the special treatment accorded the thousand acres, the Court views subpart (ii)'s requirement that the Plan complement park purposes to the fullest extent possible as much more rigorous when applied to the thousand acres.

## 2. Congressional History

Since the Act is facially unclear, the Court seeks guidance in its legislative history. The Boundary Revision Act (H.R. 846) was introduced in the House by Minnesota Congresspersons Oberstar and Vento. 127 Cong.Rec. H90 (daily ed. Jan. 13, 1981). Minnesota Senators Durenburger and Boschwitz introduced the companion bill (S. 625) into the Senate. 127 Cong.Rec. S1838 (daily ed. March 5, 1981). The nearly identical bills were the result of extensive negotiations between the State, National Park Service, and citizens groups. The bills had broad bi-partisan support from the State, Department of Interior, and the Minnesota congressional delegation. *Id.* ; 128 Cong.Rec. H7874–H7875 (daily ed. Sept. 29, 1982).

Senate bill 625 was referred to the Committee on Energy and Natural Resources (hereinafter "Senate Committee") and from there it was referred to the Subcommittee on Public Lands and Reserved Water (hereinafter "Senate Subcommittee"). The House referred H.R. 846 to the House Subcommittee on Public Lands and National Parks of the Committee on Interior and Insular Affairs (hereinafter "House Subcommittee" and "House Committee" respectively).

On October 29, 1981, the Senate Subcommittee conducted hearings on S. 625. *Boundary Revision of Voyageurs National Park: Hearing Before the Subcomm. on Public Lands and Reserved Water of the Comm. on Energy and Natural Resources, United States Senate,* 97th Cong., 1st Sess. (1981) [hereinafter cited as *"Senate Hearings"*]. On May 25, 1982, the Senate Committee submitted a report recommending passage of S. 625 with amendments. S.Rep. No. 97–423, 97th Cong., 2nd Sess. (1982) [hereinafter cited as "Senate Report"]. On June 10, 1982, the Senate considered and passed S. 625. 128 Cong. Rec. S6656 (daily ed. June 10, 1982).

The House Subcommittee then held hearings on H.R. 846 and S. 625 in July and August, 1982. *Public Land Management Policy: Hearings Before the Subcom. on Public Lands and National Parks of the Comm. on Interior and Insular Affairs, House of Representatives,* 97th Cong., 2nd Sess. (1982) [hereinafter cited as *"House Hearings"*]. Later in August, the House Subcommittee considered and passed amendments to H.R. 846 in a mark-up hearing. *H.R. 846, Voyageurs National Park, House of Representatives Subcomm. on Public Lands and National Parks, Comm. on Interior and Insular Affairs* (Aug. 19, 1982) [hereinafter cited as *"Subcommittee Mark-Up"*]. Another mark-up hearing was held before the full House Committee on September 15, 1982. *H.R. 846, To Revise the Boundary of Voyageurs National Park, House of Representatives, Comm. on Interior and Insular Affairs* (September 15, 1982) [hereinafter cited as *"Committee Mark-up"*]. Finally, on September 29, 1982, the House passed H.R. 846. 128 Cong.Rec. H7874 (daily ed. Sept. 29, 1982). Congress later made additional amendments not relevant to this action. *See, e.g.,* 128 Cong.Rec. S13237 (daily ed. Oct. 1, 1982); *id.* at H9784 (daily ed. Dec. 14, 1982); *id.* at S15308 (daily ed. Dec. 16, 1982).

■ Committee reports are considered the most persuasive indicia of congressional intent. *Housing Authority of City of Omaha, Nebraska v. United States Housing Authority,* 468 F.2d 1, 7 n. 7 (8th Cir.1972). The Senate Report on S. 625 is not without reference to wildlife. The Report includes the following statement from the Acting Secretary of the Interior:

S. 625 would also authorize the deletion of approximately 1,000 acres of land at Black Bay within the present boundary of Voyageurs National Park on condition that the State of Minnesota designate, and subsequently administer, the deleted portion as a State wildlife management area. This provision of S. 625 would resolve a controversy over duck hunting in this area which has existed since shortly after the Park's authorization. The Black Bay area was hunted by as few as 20–25 hunters a year prior to the Park's creation, but the issue

has taken on an emotional aspect harmful to the local and State cooperation needed for the effective administration of the Park. *It is understood that while waterfowling within the management area would be permitted in season, the taking of wildlife would be controlled by the State of Minnesota.* Senate Report at 7. (emphasis added)

The House Report also contains the language emphasized above. House Report at 8–9. These references to the wildlife management area clearly indicate that duck hunting will be permitted within season. The same sentences also indicate that the State will impose substantial controls on the taking of other wildlife. To understand the type of control Congress intended, the Court must look to the remaining legislative history.

Throughout the entire legislative history, one theme is pervasive—the one thousand acres of Black Bay were ceded to the State to resolve a controversy over duck hunting. Inumerable indications of congressional intent to permit duck hunting in the Gold Portage Area appear in the record. During the Senate Subcommittee hearings, Senator Durenberger testified that the transfer of the thousand acres was "contingent upon DNR designation of the portion ... as a wildlife management area, permitting the hunting of ducks...." *Senate Hearings* at 3. Similarly, in a prepared statement Russell Dickenson, the Director of the National Park Service, indicated that "the State of Minnesota would agree to designate and administer the area as a state wildlife management area, where waterfowling would be permitted in season." *Id.* at 25.

■ The record also indicates that only waterfowl hunting would be allowed within the Gold Portage Area. Senator Boschwitz testified that, "[t]he State of Minnesota has agreed to then designate the Black Bay

area as a wildlife management area, permitting duck hunting but protecting other wildlife." *Senate Hearings* at 37; *see also House Hearings* at 151. Similarly, Congressman Oberstar said in his prepared statement before the Senate Subcommittee that, "[t]he State of Minnesota would manage the lands and water of Black Bay as a wildlife management area, in which *only* waterfowl hunting would be permitted." *Id.* at 42 (emphasis supplied). This latter testimony evidences a congressional intent to prohibit all wildlife taking except waterfowl hunting within the thousand acres designated as a "wildlife management area." [3] In interpreting the statute, these statements of the legislation's sponsors should be given substantial weight. *Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976).

Further evidence of congressional intent to prohibit all taking of non-waterfowl appears in the mark-up sessions. Before recommending H.R. 846 to the full committee, the House Subcommittee held a mark-up session to consider an amendment to the bill. The amendment would have changed section 160a–1(b)(2)(B)(ii) to read:

(ii) the State has prepared a plan acceptable to the Secretary to manage all the waters of and State lands riparian to Black Bay (including all of the State-owned lands and waters of Rainy Lake) to preserve the natural resources of the area so as to complement to the fullest extent possible the purposes for which the park was established, to prevent degradation in air and water quality, *to protect fish and wildlife,* including the spawning concentrations of fish in Black Bay, Rat Root River, and Rat Root Lake, to protect the stands of vegetation around the margin of Black Bay, to prohibit the construction of permanent duck

---

**3.** Here, and elsewhere throughout the record, members of Congress used the term "Black Bay" to refer to the one thousand acre tract ceded to the State. This is particularly apparent in the above-quoted comments of Congressman Oberstar and Senator Boschwitz, which refer to Black

Bay as the wildlife management area. The Act, however, designated only the thousand acres as a wildlife management area. Black Bay is actually many times the size of the tract transferred to Minnesota.

blinds, *to prohibit the hunting of species other than waterfowl,* and to preserve the scenery geologic conditions, and waterway systems of the park.

Amendment in the Nature of Substitute of H.R. 846 (emphasis supplied).

In commenting on the bill as enacted, in light of this potential substitute, Congressman Seiberling stated, "[b]ut as the bill is written, it only permits wildfowl hunting, not other types." *Subcommittee Mark-up* at 9. Congressman Vento replied, "[t]hat is correct." *Id.*

Later, when the full House Committee considered the substitute, Congressman Vento offered an amendment to it. His amendment proposed subpart (ii) as it was later enacted by Congress. In submitting his amendment Congressman Vento commented:

> While the State is willing to accept the first part of the amendment [referring to the amendment quoted above] as the members read it in the bill, they are concerned about the specificity and the loss of flexibility that they have with the latter parts. One would prohibit hunting on state land other than waterfowl. At least that is the interpretation they have rendered to this amendment. That certainly wasn't out intent. What this does is simplifies the requirement. The Secretary would still have to approve that plan. I would remind members this would be on land that is State land, but this is part of the agreement.

*Committee Mark-up* at 8. Congressman Seiberling then said to Vento:

> I certainly have no objection to the amendment [referring to Vento's amendment which was subsequently enacted], and I think the language in the amendment is sound, because while we are ceding a portion of the Black Bay that was thought to be in the park and is

considered in the park; we are ceding it back to the States. It is adjacent to the park, itself, and it is important that the entire Black Bay area be managed in some compatible manner. That is what this provides. *It is still my understanding that it is not the intent of this amendment [again referring to Vento's amendment] to change the intent of this bill which is that the hunting on Black Bay, itself, will be limited to waterfowl.*

Id. at 8–9 (emphasis supplied). Congressman Vento then replied, "[t]hat is correct. The hunting in Black Bay would only be limited to waterfowl and, of course there would have to be a plan submitted in terms of that." *Id.* at 9.[4]

Defendants argue that in rejecting the state opposed amendment explicitly prohibiting hunting of non-waterfowl on the State-owned land and waters of Rainy Lake, Congress abandoned its intent to prohibit hunting within the Black Bay area ceded to the State. The discussions in the mark-up hearings clearly contradict this interpretation. Congressman Vento, who sponsored the subpart (ii) amendment, twice assured the committees that his amendment would not change the limitation on hunting in Black Bay itself.

Defendant relies on the testimony of Joseph Alexander, the Commissioner of the Minnesota Department of Natural Resources (hereinafter "the DNR") to argue that Congress intended to permit trapping within the Gold Portage region. When testifying before the House Subcommittee, Commissioner Alexander indicated that some wildlife management areas (hereinafter "WMA's") were managed partly as refuges. *House Hearings* at 21. Commissioner Alexander also stated that WMA's were managed:

> Portage area in the latter. Thus, according to Congressman Seiberling, the Act required that the entire Black Bay area be managed to complement the park, while the Gold Portage area ("Black Bay, itself") would be managed as a WMA where only waterfowling was permitted. *See also supra* note 3.

---

**4.** Here Congressman Vento and Seiberling refer to "Black Bay" when describing the thousand acres ceded to the State. Congressman Seiberling comments on "the entire Black Bay area" and on "Black Bay itself." The Court believes the remarks make sense if construed to refer to Black Bay in the first instance and the Gold

for the production and propagation of game, wild rice, and in some cases minor fisheries or minnow activities *but primarily for waterfowl and for some species of upland game—pheasants, sharktail, grouse, and in some cases, marginally, for rough grouse. But primarily for waterfowl and pheasants.*

*Id.* at 22 (emphasis supplied). These comments do not indicate that beaver, otter, muskrat, or other animals would be subject to trapping. Instead they lead one to believe that WMA's are managed primarily to permit waterfowl hunting and limited hunting of some other birds.

In his testimony before the Senate Subcommittee, Commissioner Alexander stated that, "S. 625 would delete [the Gold Portage] area from the park. This would permit hunting within the area." *Senate Hearings* at 49. Commissioner Alexander's reference to hunting was so vague that Senator Wallop later sent a letter to Alexander inquiring whether hunting other than duck hunting, or trapping would be permitted in the WMA. *See id.* at 79–82. Commissioner Alexander replied, "[y]es, unless I close the area to certain kinds of hunting or trapping by order." *Id.* at 81. He also answered that he would "consider taking such actions if necessary ... to cooperate with park management." *Id.*

Commissioner Alexander's response shows his willingness to be flexible in his management of the WMA. Nothing here indicates that Congress intended the Gold Portage WMA plan to be identical to any other State WMA's.[5] Moreover, Commissioner Alexander was not a member of

Congress, and his intentions for Black Bay were not necessarily those of Congress. In fact, as discussed earlier, his view that nonwaterfowl hunting would be permitted was expressly contradicted by several Congresspersons.[6]

Finally, the court relies upon the representations made to the House before it approved H.R. 846. First, Congressman Vento remarked:

The main thrust of this legislation and perhaps the park's most pressing problem is the controversy that has been generated through the inclusion of a portion of the Black Bay area within the park ..... To settle this matter, yet still provide for the utmost protection of the resources in the area, this legislation spells out procedures for turning over the 1,000 acres at Black Bay ... to the State of Minnesota *for protection as a wildlife management area.* To insure the continued proper utilization of the Black Bay area, the Interior Committee was careful to insert a number of specific provisions, including the use of a reverter clause.

128 Cong.Rec. H7875 (daily ed. Sept. 29, 1984) (emphasis supplied). Later, Congressman Oberstar stated:

The return of Black Bay to the State removes a nearly two-decades-old understanding about the boundaries of Voyageurs National Park and how this particular area should be managed. It will return to the people of Minnesota in this small area the opportunity for recreational uses not permitted within a national

---

5. Commissioner Alexander also submitted the regulations governing State WMA's to both the House and Senate Subcommittees. These regulations included provisions permitting nonwaterfowl hunting and trapping. Yet, his testimony was clear that WMA's are managed differently depending on the circumstances. Therefore, the Court cannot conclude that these regulations were considered as governing the Gold Portage WMA, especially when members of Congress believed no nonwaterfowl hunting would be allowed there.

6. Defendants contend that the record evidences no intent to prohibit trapping because nearly all

references are to hunting. The legislative history suggests that Congress transferred the Gold Portage region to the State to permit duck hunting, and that it viewed duck hunting as a narrow exception to the broad proscription against hunting and trapping within the national parks. When the Act was passed, the Park Service regulations used the term "hunting" to include trapping. *See* 36 C.F.R. § 2.32 (1982) (entitled "Wildlife; Hunting"). Consequently, the word "hunting" encompassed trapping. The Court finds that Congress intended to prevent the hunting of nonwaterfowl regardless of the form of taking. *See supra* page 538.

park, and *will resolve a longstanding controversy over duck hunting in Black Bay.*

*Id.* at H7877 (emphasis supplied).

██ The Court concludes that Congress intended to resolve a long standing boundary dispute and duck hunting controversy in the Gold Portage area. To fulfill its concern that the wildlife there be protected, Congress provided that the State must establish a Gold Portage wildlife management area for the Secretary's approval. Congress intended that the wildlife management area covering the thousand acres preclude all taking of wildlife except waterfowl. By approving a provision for trapping within the Gold Portage region, the Secretary of Interior violated the Boundary Revision Act.[7]

### ORDER

Since this opinion disposes of plaintiffs' claims, the Court will enter judgment as follows:

IT IS ORDERED that plaintiff's motion for summary judgment on Count I of the Complaint is granted as to the one thousand acre tract ceded to the State.

IT IS FURTHER ORDERED that the defendants' motions for summary judgment are denied.

IT IS DECLARED that the Secretary of Interior violated the Boundary Revision Act by approving a wildlife management plan which permitted trapping within the one thousand acres ceded to the State of Minnesota.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

[7.] After the House Subcommittee discovered that the Secretary had approved a management plan permitting trapping, it held an oversight hearing. *See Oversight Hearing on Fiscal 1985 Budget Request and the Land and Water Conservation Fund Before the House Subcomm. on Public Lands and National Parks,* 98th Cong., 2nd Sess. 34–42 (1984). During the hearing, Congressman Vento scolded Secretary of Interior Ray Arnett for approving a plan which permitted trapping, and he expressed his opinion that the Secretary had violated Congress' intent in providing for trapping in the area. *Id.* at 35. Although subsequent history is not entitled to great weight, it is still entitled to consideration, *Montana Wilderness Ass'n v. United States Forest Service,* 655 F.2d 951, 957 (9th Cir.1981). *Cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), and here it substantiates the Court's conclusion.