Justice Breyer,
dissenting.
This petition raises the question whether federal law recognizes a special Secret Service evidentiary privilege which, in effect, would permit a Secret Service agent protecting the President to refuse to testify unless he saw or heard conduct or statements that were clearly criminal. To put the matter more precisely, the Secret Service claims a privilege that would protect
“information obtained by Secret Service personnel while performing their protective function in physical proximity to the President,”
except that it would not apply
“in the context of a federal investigation or prosecution, to bar testimony by an officer or agent concerning observations or statements that, at the time they were made, were sufficient to provide reasonable grounds for believing that a felony has been, is being, or will be committed.” In re: Sealed Case, 148 F. 3d 1073, 1075 (CADC 1998) (internal quotation marks omitted).
The Court of Appeals denied the existence of such a privilege. The Secretary of the Treasury asks this Court to review that determination.
I believe the question is important and that this Court should grant review. The physical security of the President of the United States has a special legal role to play in our constitutional *991 system. The Constitution vests the entire “Power” of one branch of Government in that single human being, the “President” of the United States. Art. II, § I, cl. 1. He is the head of state. He and the Vice President are the only officials for whom the entire Nation votes. And he is responsible for the actions of the Executive Branch in much the same way that the entire Congress is responsible for the actions of the Legislative Branch or the entire Judiciary for those of the Judicial Branch. He has been called “‘the sole indispensable man in government.'” Clinton v. Jones, 520 U. S. 681, 713 (1997) (Breyer, J., concurring in judgment) (quoting P. Kurland, Watergate and the Constitution 135 (1978)). Thus, one could reasonably believe that the law should take special account of the obvious fact that serious physical harm to the President is a national calamity—by recognizing a special governmental privilege where needed to help avert that calamity.
Moreover, the federal courts themselves have adequate legal authority to develop an evidentiary privilege that will materially help to ensure the physical safety of the President. Federal Rule of Evidence 501 says that “the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.” This Court has held that this Rule “did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to continue the evolutionary development of testimonial privileges.” Jaffee v. Redmond, 518 U. S. 1, 9 (1996) (internal quotation marks omitted). See also United States v. Weber Aircraft Corp., 465 U. S. 792, 804, n. 25 (1984) (“Rule 501 was adopted precisely because Congress wished to leave privilege questions to the courts rather than attempt to codify them”). 'Hie Court has suggested that a privilege will apply where permitting a refusal to testify serves “‘a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth/” Trammel v. United States, 445 U. S. 40, 50 (1980) (quoting Elkins v. United States, 364 U. S. 206, 234 (1960) (Frankfurter, J., dissenting)). The Court of Appeals recognized that the President’s physical safety amounts to the kind of transcendent public good that, in principle, might justify the recognition of a new privilege here, In re: Sealed Case, supra, at 1076, just as important public need has led the courts to recognize new privileges in other cases, Jaffee *992 v. Redmond, supra; Upjohn Co. v. United States, 449 U. S. 383, 394-395 (1981) (extending attorney-client privilege to cases involving communication between a corporation’s employees acting at the direction of its officers and the corporation’s attorney); Totten v. United States, 92 U. S. 105, 107 (1876) (state secrets privilege); cf. 8 J. Wigmore, Evidence §§2290, 2333 (J. McNaughton rev. 1961) (explaining how common-law courts developed lawyer-client privilege and spousal privilege between the 16th and 19th centuries).
I concede that this Court, when analyzing a new claim of privilege, has looked to the ability of the privilege to win acceptance in federal courts and other jurisdictions. Jaffee v. Redmond, supra, at 12-13; Trammel v. United States, supra, at 47-50. There is no precedent for the privilege claimed in this ease. But, as the Court of Appeals pointed out, the lack of precedent is "hardly surprising,” for this “appears to be the first effort in U. S. history to eompel testimony by agents guarding the President.” In re: Sealed Case, 148 F. 3d, at 1076. For that reason, the Court of Appeals decided that "the absence of precedent” did not “weig[h] heavily against recognition of the privilege.” Ibid. In my view, that determination was correct.
Further, there are strong reasons for believing that a President's physical safety requires the nearby presence of Secret Service agents. The terrible truth, as we all know, is that assassins have killed four American Presidents and have wounded one other. Nine Presidents have been the subject of assassination attempts, including attempts that have taken place while the President was in the White House itself. In addition, a would-be assassin fired a pistol at President-elect Roosevelt three weeks before his inauguration, and the United States has accused a foreign government of planning the assassination of former President Bush when he visited Kuwait in 1993. See Appendix, infra, at 996.
History also teaches that the difference between life and death can be a matter of a few feet between a President and his protectors. President McKinley, for example, standing in a receiving line at the Pan American Exposition in Buffalo, was approached by an assassin, gun in hand hidden under a handkerchief. A Seeret Service agent next to the President, and noticing the handkerchief, might have stopped the assassin. But there was no agent next to the President, for exposition officials *993 had requested those places. The assassination succeeded. N. Y. Times, Sept. 7, 1901, p. 1, col. 2; App. to Pet. for Cert. 42a.
By way of contrast, when John Hinckley fired shots at President Reagan, a Secret Service agent next to the President immediately pushed the President toward a limousine, another pushed the two men into the car, and a third spread his arms and legs to protect the President (and was hit in the chest). The President’s life was saved. P. Melanson, The Politics of Protection: The U. S. Secret Service in the Terrorist Age 186 (1984) (hereinafter Melanson). When a woman pointed a loaded semiautomatic pistol at President Ford, a Secret Service agent standing next to the President quickly grabbed the weapon with one hand and the woman’s arm with the other. After another agent shouted a code warning, two agents grabbed the President and others swiftly surrounded him as they escorted him away. N. Y. Times, Sept. 6, 1975, p. 1, col. 8. Only two weeks later, a shot was fired at President Ford in San Francisco. The President was immediately shielded and hustled into his limousine. N. Y. Times, Sept. 23, 1975, p. 1, col. 8.
As these examples indicate, the Secret Service seeks to surround a President with “an all-encompassing zone of protection,” such that agents, once alerted, can form a human shield within seconds. App. to Pet. for Cert. 41a. The Secret Service submitted undisputed affidavits stating that it cannot carry out this strategy effectively unless agents are near, and often next to, the President. Id., at 37a-93a.
Even when the President is at the White House, the need for protection, and the corresponding need for agents to stay close to the President, does not disappear. A man unknown to President Carter visited him at the Oval Office. During the Reagan administration, a man on the Secret Service’s list of dangerous persons, and with a history of mental disorders, reached the Oval Office without being stopped. Melanson 92. And as noted above, shots were fired at the White House when President Clinton was there. Even though the President was in the private residence at the time, agents fell upon the President within seconds to cover him and move him away from windows. App. to Pet. for Cert. 57a-58a.
Finally, I turn to what the Court of Appeals considered the key question in dispute: Is there a significant likelihood that, without the evidentiary privilege, Presidents too often will keep *994 agents at a distance? The words “too often” are important here. No one believes that the President would refuse protection outright. He cannot do so according to law. 18 U. S. C. § 3056(a). But no law can prescribe the President’s attitude toward security. No law can dictate how faithfully the President follows the Secret Service’s advice regarding security measures. And Presidential security may turn on close questions of degree. The Court of Appeals recognized that the matter was one of degree. It concluded that the Secretary had not shown the benefits of recognizing the privilege with sufficient force. Yet I believe this conclusion is open to significant doubt, particularly for the following two reasons.
First, the complexity of modem federal criminal law, codified in several thousand sections of the United States Code and the virtually infinite variety of factual circumstances that might trigger an investigation into a possible violation of the law, make it difficult for anyone to know, in advance, just when a particular set of statements might later appear (to a prosecutor) to be relevant to some such investigation. Thus, without the privilege, a President could not count on privacy. Rather, he would have to assume, in respect to many Presidential conversations, some genuine risk that a nearby Secret Service agent might later have to divulge their contents.
At the same time there may well be conversations—perfectly lawful conversations, concerning, say, polities or personalities— which a President reasonably would not want divulged. Unless those conversations clearly fall within the bounds of “executive privilege,” the bounds of which are unclear, ef. Memorandum for All Executive Department and Agency General Counsels, from Lloyd Cutler, Special Counsel to the President (Sept. 28, 1994), the only way a President could assure privacy would be to create a physical distance between himself and his Secret Service staff. The problem, in other words, arises in respect to ordinary conversations, not in respect to the unusual circumstance of an obvious crime.
Second, former President George Bush, several past and present directors of the Secret Service, and all of the now-living former Special Agents in Charge of the Secret Service detail assigned to protect the President presented statements, either sworn or as amici, declaring that the absence of a privilege will cause the President to lose trust in his agents and keep them *995 at a distance. This conclusion is plausible in light of human psychology that could lead Presidents to discount certain invisible dangers, such as the risk of assassination in surroundings that seem familiar and where all seems secure. Presidents may ignore those inherent dangers to some small degree, if they do not like having another individual, even an unobtrusive Secret Service agent, right next to them wherever they go. Presidents have not always eagerly accepted the omnipresence of their protectors. Politicians often feel the need to mingle with the public in a way that frustrates the Secret Service’s goal of maintaining a controlled environment. And even for those who accept their protectors, enthusiasm can wear thin as the Service pervades the President’s private as well as public life. Melanson 126. Franklin Roosevelt, for example, would try to elude his protectors. See Tays, Presidential Reaction to Security: A Longitudinal Study, 10 Presidential Studies Quarterly 600, 601-602 (1980). President Truman summed up his attitude toward the Secret Service as follows: “‘Kind and considerate as the Secret Service men were in the performance of their duty, I couldn’t help feeling uncomfortable.’” Id., at 603.
A delicate relationship exists between the President and his privacy-intruding protectors, one that may be particularly sensitive to the trust that comes from knowing that what the agents learn in the course of their duties will never be made public. That, in any event, is what the sworn statements set forth in the record and the briefs suggest. Those who provided those statements are in a position to know. It is difficult to characterize the statements as “speculation,” In re: Sealed Case, 148 F. 3d, at 1076, particularly when the record contains nothing to the contrary.
The upshot, in my view, is that this Court should answer the question whether some kind of protective privilege exists and determine its outlines (whether, for example, it is waivable by the President). The matter is, as the Court of Appeals conceded, “fairly disputed.” Id., at 1079. It is legally uncertain. It is important. And only this Court can provide an authoritative answer.
The Independent Counsel at one point argued that “only this Court has the moral authority and public credibility to issue a final ruling on what the Secret Service plainly believes is a sensitive, life-or-death issue.” Pet. for Cert. in United States v. *996 Rubin, O.T. 1997, No. 1942, p. 10 (redacted version). I agree. This Court, not a lower court, should decide this close legal question directly related to the physical security of the President of the United States.
I therefore dissent from the Court’s denial of the writ.
APPENDIX TO OPINION OP BREYER, J.
Presidential Assassinations and Assaults
[[Image here]]
Sources: Kaiser, Presidential Assassinations and Assaults: Characteristics and Impact on Protective Procedures, 11 Presidential Studies Quarterly 545, 546-547 (1981); N. Y. Times, June 28,1993, section A, p. 7, col. 2; N. Y. Times, Apr. 5,1995, section A, p. 16, col. 5.