Vaidik, Chief Judge,
concurring in part and dissenting in part.
I concur with the majority as to all issues except one. That is, I dissent from the majority’s conclusion that Governor Pence has met his burden of showing that the white paper is not subject to disclosure under APRA because it is a privileged attorney-client communication pursuant to the common-interest doctrine.[13] In order *1124 for the common-interest doctrine to apply, the parties must first come to an agreement, and documents exchanged before an agreement is reached are not protected from disclosure. Here, there is no evidence in the record that Governor Pence and Texas officials reached an agreement before the white paper was emailed. As a result, I believe that the email served as a recruiting or lobbying tool by the State of Texas to encourage other states to join its legal challenge to President Obama’s executive orders on immigration. Because lobbying and soliciting are not protected by the common-interest doctrine, I believe that Governor Pence has not met his burden of showing that the white paper is protected from disclosure under APRA.
As our legislature recognized in the opening sentence of APRA, “A fundamental philosophy of the American constitutional form of representative government is that government is the servant of the people and not their master.” Ind. Code §• 5-14-8-1. Accordingly, it is the policy of this state that “all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees.” Id. This is so because “[p]roviding persons with the information is an essential function of a representative government and an integral part of the routine duties of public officials and employees, whose duty it is to provide the information.” Id. In short, “APRA is intended to ensure Hoosiers have broad access to most government records.’’ Evansville Courier & Press v. Vanderburgh Cty. Health Dep’t, 17 N.E.3d 922, 928 (Ind. 2014). APRA is liberally construed to implement this policy, with the burden for nondisclosure on the public agency denying access. I.C. § 5-14-3-1; ESPN, Inc. v. Univ. of Notre Dame Police Dep’t, 62 N.E.3d 1192, 1196 (Ind. 2016).
Here, the majority finds that Governor Pence has met his burden of showing that the white paper is not subject to disclosure under APRA because it is a privileged attorney-client communication pursuant to the common-interest doctrine. The common-interest doctrine is an exception to the general rule that no privilege attaches to communications between a client and an attorney in the presence of a third person. United States v. EDO Seidman, LLP, 492 F.3d 806, 815 (7th Cir. 2007); Price v. Charles Brown Charitable Remainder Unitrust Tr., 27 N.E.3d 1168, 1173 (Ind. Ct. App. 2015), trans. denied. The common-interest doctrine permits parties whose legal interests coincide to share privileged materials with one another in order to more effectively prosecute or defend their claims. Am. Mgmt. Servs., LLC v. Dep’t of the Army, 703 F.3d 724, 732 (4th Cir. 2013); Price, 27 N.E.3d at 1173.
For the doctrine to apply, the parties must first come to an agreement. See In re Pac. Pictures Corp., 679 F.3d 1121, 1129 (9th Cir. 2012) (“[A] shared desire to see the same outcome in a legal matter is insufficient to bring &' communication between two parties within this exception. Instead, the parties must make the com *1125 munication in pursuit of a joint strategy in accordance with some form of agreement — whether written or unwritten.” (citation omitted)); Hunton & Williams v. U.S. Dep’t of Justice, 590 F.3d 272, 274 (4th Cir. 2010) (explaining that it is “not enough that the agency was simply considering whether to become involved”; rather, an agreement is required)[14]; see also Restatement (Third) of the Law Governing Lawyers § 75 cmt. a (Am. Law Inst. 2010) (“Whether a client-lawyer relationship exists between each client and the common lawyer is determined under § 14, specifically whether they have expressly or impliedly agreed to common representation in which confidential information will be shared. A co-client representation cari begin with a joint approach to a lawyer or by agreement after separate representations had begun.” (emphasis added)).
Timing of the agreement is important. “Documents exchanged before a common interest agreement is established are not protected from disclosure.” Hunton & Williams, 590 F.3d at 285 (emphasis added). The danger in extending the common-interest doctrine to a point in time before an agreement is reached is that “mere lobbying efforts, as opposed to joint litigation strategy, will be” protected. Id.) see also Am. Mgmt. Servs., 703 F.3d at 732 (explaining that for the common-interest doctrine to apply, there must be an agreement “at the time of the communications at issue” (emphasis added)); Hunton & Williams, 590 F.3d at 285 (“Thus, a proper assessment of the applicability of the common interest doctrine in this case requires a determination of the point in time when DOJ decided that it was in the public interest for RIM to prevail in its litigation with NTP and agreed to partner with RIM in doing so.” (emphasis added)); Price, 27 N.E.3d at 1173 (“The privilege is limited to those communications made to further an ongoing joint enterprise with respect to a common legal interest.” (citation omitted) (emphasis added)).
Here, I believe that Governor Pence has not met his burden of showing that he had agreed to partner with Texas in its legal challenge to President Obama’s executive orders on immigration when Hodge emailed the white paper to the thirty recipients (including Governor Pence’s chief of staff) on November 25, 2014. The record shows that Hodge emailed the thirty recipients “to follow-up on comments my boss made during the Governors-Only meeting last week.” Appellant’s App. Vol. 2 p. 30. Hodge explained that “[d]uring last week’s meeting, Governor-elect Abbott promised that we would circulate a white paper outlining the legal theories supporting [Texas’] legal challenge [to President Obama’s recent executive orders on immigration] to the other Governors.” Id. Contrary to the majority’s" implication, there is no evidence in the record that Governor Pence or anyone from his staff knew about, let alone attendéd, this meeting or that Governor Pence or anyone from his staff found out before receiving the email what was actually discussed at the meeting. See Oral Arg. at 23:28-23:35 (Governor Pence’s attorney conceding at oral argument that *1126 there is no evidence in the record that Governor Pence attended the meeting); see also id. at 13:00-13:43 (Groth’s attorney noting at oral argument that the record does not disclose information about the meeting). This lack of evidence is buttressed by the email itself, which says, “As some of you may have heard, the State of Texas is preparing a legal challenge to the President’s recent executive orders on immigration.” Appellant’s App. Vol. 2 p. 30 (emphasis added). There is also no evidence in the record that Governor Pence or anyone from his staff asked to receive, agreed to receive, or expected to receive the email. See Oral Arg. at 9:50-10:07 (Groth’s attorney pointing out at oral argument that the record is silent as to whether Governor Pence was expecting to receive the email). In short, there is simply no evidence in the record that Governor Pence or a member of his staff communicated with Texas officials in any way about joining Texas’ legal challenge to President Obama’s executive orders on immigration before the white paper was emailed on November 25, 2014.[15]
As such, I believe that Hodge’s email served as a lobbying or soliciting tool by Texas to encourage other states to join its legal challenge. As the email itself states, “Our hope is that other states will join the State of Texas’ legal action so that we will have a broad coalition to challenge the President’s action .... ” Appellant’s App. Vol. 2 p. 30 (emphases added). The common-interest doctrine does not protect mere lobbying efforts but rather only joint strategy. See Hunton & Williams, 590 F.3d at 285. Accordingly, I believe that the white paper, which was emailed before any sort of agreement was reached, is not protected from disclosure as a privileged attorney-client communication pursuant to the common-interest doctrine.
Furthermore, this case is easily distinguishable from Corll v. Edward D. Jones & Co., 646 N.E.2d 721 (Ind. Ct. App. 1995), trans. not sought, which the majority heavily relies on. In that case, several prospective plaintiffs attended a series of group meetings that were also attended by attorneys who later became the plaintiffs’ counsel. The purpose of the meeting was to gather prospective plaintiffs who had dealt with a brokerage firm’s employee in order to discuss their investment losses. We set forth the following rule:
When two or more persons, with a common interest in some legal problem, jointly consult an attorney, “their confidential communications with the attorney, though known to each other, will of course be privileged in a controversy of either or both the clients with the outside world.”
Id. at 725 (quoting McCormick on Evidence § 91 (4th ed. 1992) (emphasis added)); see now McCormick on Evidence § 91.1 (7th ed. 2013). Unlike Corll, where the parties came together in pursuit of a joint strategy, here there is no evidence that Governor Pence and Texas’ lawyers *1127 came together in pursuit of a joint strategy at any point before the white paper was emailed. In the absence of such evidence, the email was a one-way solicitation designed to encourage Indiana to join Texas’ legal challenge to President Obama’s executive orders on immigration.
The policy of APRA is to provide the public with full and complete information about the affairs of the government. Indeed, providing the public with information “is an essential function of a representative government.” I.C. § 5-14-3-1. Because the record reflects that Hodge emailed the white paper to Governor Pence’s chief of staff in order to lobby or solicit Indiana to join Texas’ legal challenge, and before any sort of agreement between Governor Pence and Texas was reached, I believe that Governor Pence has not met his burden of showing that the white paper is protected from disclosure under APRA. I would therefore reverse the trial court on this issue and order Governor Pence to produce the white paper.

. The majority also finds that the white paper is protected from disclosure as delibera *1124 tive material. I disagree. Indiana Code section 5-14-3-4(b)(6) permits a public agency, in its discretion, to withhold from disclosure "[records that are intra-agency or interagency advisory or deliberative material '... that are expressions of opinion or are of a speculative nature, and that are communicated for the purpose of decision making.” The majority finds that the white paper is a protected "in-tra-agency” record. Although the white paper was not prepared by anyone within the Governor’s office, the majority, without citation to authority, finds that it qualifiés as an intra-agency record because Governor Pence "used” it within his office. Op. at 1122. I do not believe that a public agency can protect a record from disclosure as deliberative material just by “using” it.

. The majority recognizes this principle of law. See op. at 1121-22. However, the majority, relying on Corll v. Edward D. Jones & Co., 646 N.E.2d 721 (Ind. Ct. App. 1995), trans. not sought, finds that it is “not the Indiana rule,” as Indiana recognizes that "the attorney-client privilege attaches to preliminary discussions between attorneys, prospective clients, and other potential parties who share a common interest concerning a potential lawsuit.” Op. at 1122. As explained later in my dissent, I believe that Corll is factually distinguishable from this case. Moreover, I believe that Indiana law requires that the communication at issue be made in pursuit of a joint strategy in accordance with some form of agreement — written or unwritten.

. The majority sua sponte takes judicial notice of a press release that Governor Pence issued on November 20, 2014, five days before the white paper was emailed. In the press release, Governor Pence indicated that he disagreed with President Obama's executive orders on immigration. The press release, however, does not establish that an agreement existed between Governor Pence and Texas when the November 25, 2014, email was sent. The majority also cites as support an email that Governor Pence disclosed to Groth wherein a reporter asked Governor Pence’s communications director if the governor had any comment regarding "talk among some governors” that President Obama’s executive orders would pose operational challenges for the states. Appellant's App. Vol. 2 p. 25. Again, this email does not establish that Governor Pence and Texas had an agreement when the November 25, 2014, email was sent.